MGD

WO

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Douglas Wayne Derello,

          Plaintiff,

v.

Lori Stickley, et al.,

          Defendants.

No.   CV 19-05363-PHX-MTL (JFM)

**ORDER**

Plaintiff Douglas Wayne Derello, who is currently confined in the Arizona State Prison Complex (ASPC)-Eyman, brought this pro se civil rights action pursuant to 42 U.S.C. § 1983.  Before the Court are Motions for Summary Judgment filed by Defendant Hahn (Doc. 85) and Defendants Digiro, Harris, Scott, and Pond (Doc. 93).  Plaintiff was informed of his rights and obligations to respond to the Motions pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Docs. 89, 96), and he opposes the Motions.  (Docs. 121, 135.)  Also before the Court are Plaintiff's "Motion to Inform the Court of a Pressing D[i]lemma" (Doc. 129) and "Motion to Notify Court" (Doc. 143), which the Court construes as motions for injunctive relief.  In addition, Plaintiff has filed a "Motion to Correct Wrongly Added Grievance to (DKT. 129)" (Doc. 148), a "Motion to Correct Submitted Unsigned Motion (DKT. 139)" (Doc. 149), and a "Motion to Inform the Court of an Unexpected Circumstance" (Doc. 150).

. . . .

. . . .

## I.       Background

On screening of Plaintiff's First Amended Complaint (Doc. 8) under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated the following claims in Count Two: First Amendment retaliation and Eighth Amendment claims against Defendant Sergeant N. Harris regarding the denial of a medically prescribed shower chair and showers; an Eighth Amendment claim against Defendant Sergeant C. Digiro regarding the denial of a medically prescribed lower bunk order; a First Amendment retaliation claim against Defendant Assistant Deputy Warden Scott regarding the denial of recreation; and an Eighth Amendment claim against Defendant Sergeant Pond regarding the denial of recreation. (Doc. 16.)[1]   The Court further determined that Plaintiff stated an Eighth Amendment medical care claim against Defendant Nurse Practitioner (NP) Hahn in Count Three. (*Id.*) The Court directed these Defendants to answer the claims against them and dismissed the remaining claims and Defendants. (*Id.*)

## II.      Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable

---

[1] The citation refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

**III.  Defendant Hahn's Motion for Summary Judgment**

**A.  Procedural Issue**

Defendant Hahn argues in her Reply that Plaintiff's Response fails to comply with Local Rule 56.1(b) because Plaintiff (1) fails to address each of Defendant's facts individually but instead lumps several of Defendant's paragraphs together; (2) fails to provide appropriate citations to disputed facts but instead provides "spotty references to the record which do not clearly indicate which fact is at issue"; (3) fails to provide a statement of numbered paragraphs to identify facts in support of his own response, with citations to exhibits; and (4) fails to provide a declaration or other probative evidence to dispute facts based on personal recollections.  (Doc. 117 at 2-3.)  Defendant argues to the extent Plaintiff failed to provide a controverting statement of facts in compliance with the local and federal rules, her Statement of Facts should be deemed undisputed.  (*Id.* at 4.)

Local Rule of Civil Procedure 56.1 requires a summary judgment movant to file a separate statement of facts setting forth each material fact supporting the motion.  LRCiv 56.1(a).  Each material fact must refer to the specific admissible portion of the record where the fact finds support.  The Local Rule requires the nonmovant to file a controverting

statement of facts that corresponds to each of the paragraphs in the movant's statement of facts and indicates whether the party disputes each asserted fact.  LRCiv 56.1(b).  The nonmovant may also set forth any additional facts that it believes preclude summary judgment.  *Id.*

In support of her Motion for Summary Judgment, Defendant Hahn submitted a Separate Statement of Facts setting forth 35 paragraphs of asserted facts.  (Doc. 86.) Plaintiff initially filed a Cross-Motion for Summary Judgment (Doc. 114), which was eventually stricken, and a Statement of Facts (Doc. 115) with approximately 110 pages of exhibits.  Plaintiff then filed his Response (Doc. 113) and a Controverting Statement of Facts (Doc. 121), which, as far as the Court can tell, refers to both the attached 20 pages of exhibits as well as the 120 pages of exhibits attached to his earlier Statement of Facts at Doc. 115.  Plaintiff also filed corrections to his Controverting Statement of Facts with additional exhibits, including a Declaration.  (*See* Doc. 118.)

As a pro se litigant, Plaintiff is afforded some leeway in the application of the rules governing summary judgment.  The Ninth Circuit has directed district courts to "construe liberally motion papers and pleadings filed by pro se inmates and [ ] avoid applying summary judgment rules strictly." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). As such, where the Court can piece together Plaintiff's evidence contained in his multiple filings, the Court will do so to determine whether there is a genuine issue of material fact, and the Court declines to consider all of Defendant Hahn's facts undisputed.

**B.    Relevant Facts**

Plaintiff's medical history includes hypertension, obstructive sleep apnea, contact dermatitis, gout due to renal impairment, and carpal tunnel.  (Doc. 86 (Def. Hahn's Statement of Facts) ¶ 1.)  Gout is a condition in which uric acid levels in the blood rise and causes joint inflammation, especially in the big toe, and sometimes the knees and ankles. (*Id.* ¶ 5.)  There is a strong correlation between gout and other serious health problems, most notably hypertension and kidney disease, with hypertension the most common

comorbidity of gout, particularly in African American males.[2]  (*Id.* ¶ 8.)  When treating a patient with multiple co-morbidities, such as Plaintiff, Defendant NP Hahn takes a "whole patient" approach because one condition may contribute to or be connected to another condition.  (*Id.* ¶ 10.)  For example, medications used to treat hypertension can cause or exacerbate gout, but untreated hypertension can cause other problems, such as kidney damage.  (*Id.*)

Plaintiff has suffered severe gout since 2000 and has used a wheelchair since 2013 because gout limits his ability to walk.  (Doc. 8 at 13.)  Plaintiff had three encounters with Defendant Hahn in 2018 and 2019—on December 5, 2018, February 7, 2019, and on March 25, 2019.  (Doc. 118 at 7 ¶ 18.)

On December 5, 2018, Plaintiff saw Defendant Hahn for follow-up care, and he reported swelling/edema in all joints, fingers, hand, and knees for the past several weeks.  (Doc. 115-2 at 12.)  Hahn noted Plaintiff's uric acid level as 8.1, assessed Plaintiff with "gout joints," and ordered Allopurinol and prednisone.  (*Id.* at 12-13.)  Hahn's plan of care included "purine free diet will assess weekly for now and then advise diet[.]"  (*Id.* at 14.)

On January 3, 2019, Plaintiff saw Defendant Hahn for follow-up care.  (Doc. 115-3 at 8.)  Hahn noted under "Subjective Notes" "Joints swelling/edema symptoms improve renal diet is now able to put on shoes but hands still edematous.  Has been on renal diet in the past and is effective for he would like to try the renal diet again due to gout."  (*Id.*)  Hahn wrote in her assessment "gout symptoms see uric acid high normal."  (*Id.* at 10.)  Hahn ordered a renal dialysis diet due to "long standing history renal problems as well as gout."  (*Id.* at 11.)  She also noted Plaintiff was no longer taking allopurinol because it

---

[2] Plaintiff states that he disputes Defendant Hahn's paragraph 8, but Plaintiff only cites various, multi-page exhibits, and he does not say what he disputes in paragraph 8. (*See* Doc. 121 at 4 ¶ 8, citing PSOF Exhibit 5, IDN 48-69 and PSOF Exhibit 6, IDN 70-80, and Attachments A-C.)  Because Plaintiff does not identify any specific pages from those records supporting his dispute and he does not say in his controverting Statement of Facts what exactly he disputes, the Court cannot determine if there is an actual dispute of material fact.  Plaintiff follows this pattern with many of Defendant's facts, and the Court will not further note these disputes unless Plaintiff's intent is readily discernible from the cited materials.  As the Court has already noted, it will rely on Plaintiff's evidence, where possible, to determine if there is a genuine dispute of material fact.

"causes worsening pain and symptoms when he takes this medication watching renal function." (*Id.*)

On February 7, 2019, Plaintiff saw Defendant Hahn for a chronic care encounter related to gout and his ongoing need for a wheelchair. (Doc. 86 ¶ 4.) Plaintiff arrived at the medical unit with the assistance of his wheelchair pusher. (Doc. 8 at 13.) Hahn approached Plaintiff and said, "get up from that wheelchair," and Plaintiff stood up. (*Id.*) Hahn then said, "walk to here with me," and Plaintiff walked with her to her office. (*Id.*) At the office, Hahn "blocked the doorway and said, let's continue to walk." (*Id.*) Plaintiff asked, "Dr. how far are you talking?, and she said, just come on." (*Id.*) As they walked, Plaintiff fell against the wall complaining about the pain in his ankle and foot. (*Id.*) Hahn said, "come on." (*Id.*) Plaintiff's wheelchair pusher then said, "you know that he cannot be up walking like that," and the wheelchair pusher was told to go outside by the medical security staff. (*Id.* at 14.) Hahn then told the security officer to order Plaintiff to continue walking, which the officer did, and Plaintiff tried his best to walk. (*Id.*) Plaintiff told Hahn, "please my gout is beginning to inflame and the pain is hurting me—she said, just a little more." (*Id.*) Plaintiff "ended up hobbling around the entire inside of medical." (*Id.*) By the time he reached his wheelchair, Plaintiff's ankle had started to swell, and Hahn said, "oh my gosh, you are the one with chronic gout." (*Id.*) Hahn then called to supervisor Rainey and said, "Derello is the one with gout we should not [] have [had] him up walking." (*Id.*) Hahn then apologized to Plaintiff and said "there are so many people here in wheelchair that should not be, that we been told to get those that should not be, out of them. But you should have never been on this list." (*Id.*) Plaintiff said, "I told you that I had gout and was in pain—look at my foot," and Hahn again apologized. (*Id.*) Hahn said, "you'll be alright," entered something into the computer, got Plaintiff two bags of medical ice, and called the wheelchair pusher to come get Plaintiff. (*Id.*) That night Plaintiff's ankle was swollen, and he was in so much pain and suffering he could not sleep. (*Id.*)

Hahn has no recollection of asking Plaintiff to walk, and it would not have been her custom to ask a wheelchair-bound prisoner to walk without first conducting a physical

examination.  (Doc. 86 ¶ 6.)  Hahn did not take away or otherwise prevent Plaintiff from using a wheelchair, and, in her clinical judgment, the wheelchair was indicated based on Plaintiff's clinical presentation.  (*Id.* ¶ 12.)

The medical record for February 7, 2019 states in the subjective notes: "assessment for wheelchair[.] Cannot walk 100 feet without pain unsteady has limp as well as swollen joints.  diet renal severe gout improving with diet. . . . gout improved." (Doc. 115-1 at 14.) Hahn documented a normal physical examination, except for swelling (edema) in Plaintiff's extremities.  (Doc. 86 ¶ 11.)  Plaintiff had normal pedal pulses, foot exam, no leg ulcers, and normal findings with respect to the heart, lungs, skin, and abdomen.  (*Id.*) Plaintiff's blood pressure was slightly elevated at 130/90, and Hahn noted Plaintiff's hypertension was under fair control even though he was not currently taking antihypertensive medication.  (*Id.*)  Hahn gave Plaintiff medical ice due to swelling, ordered labs to assess Plaintiff's kidney and liver functions, to measure his blood glucose and LKL, and to establish a baseline from which Hahn could track and manage Plaintiff's co-morbidities, including gout, and assess the appropriateness of medications to manage his medical conditions.  (*Id.* ¶¶ 20-22.)  Hahn documented that Plaintiff "was placed on renal diet now with no red meat." (Doc. 115-1 at 16.)  A renal diet helps decrease uric acid levels in the body, reduces the risk of recurring gout attacks, slows the progression of joint damage, and helps with obtaining a healthy weight.  (*Id.* ¶ 23.)

According to Defendant Hahn, she did not have any encounters with Plaintiff after February 7, 2019, and Plaintiff was transferred to a new unit on April 10, 2019.  (Doc. 86 ¶ 34.)  Plaintiff disputes that his contact with Defendant Hahn was limited to this one encounter.

Plaintiff submitted a Health Needs Request (HNR) dated February 7, 2019, stating that he needed to be seen because he was made to walk while he was at medical, his gout was inflamed, and he was in pain.  (Doc. 115-1 at 22.)  The response by Registered Nurse (RN) M. Owiti dated February 9, 2019, says Plaintiff was seen on the nurse line.  (*Id.*)

On February 9, 2019, Plaintiff saw RN Owiti at sick call; Owiti noted Plaintiff's report of a serious flare up of gout with swelling/edema in most joints of his hands and legs, that he was unable to walk or get a good night's sleep due to pain, and that he was not taking any medication for pain or inflammation. (*Id*. at 23.) Owiti documented that Plaintiff had visible swelling of the joints of the legs and hands, non-pitting edema, and obvious joint deformity. (*Id*. at 24.) Owiti issued a temporary Special Needs Order (SNO) for Plaintiff to have medical ice two times a day for three days. (*Id*. at 27.) Owiti instructed Plaintiff to hydrate, elevate his legs, use cold compresses as needed, and to submit an HNR if symptoms worsened. (*Id*. at 29.)

On February 24, 2019, Plaintiff was seen on the nurse line for diet counseling due to non-compliance with his new renal diet. (Doc. 86 ¶ 26.) Plaintiff was educated to sign for the diet daily or risk it being discontinued. (*Id*.) Plaintiff has never refused his diet, but he was on more than one diet, which "is where the confusion come[s] in." (Doc. 118 at 6 ¶ 12.) The medical record on that date states that Plaintiff reported "he was on allergy diet for peanuts but was recently switched to Renal diet. [Plaintiff] states on new diet currently and has been signing for it." (Doc. 115-5 at 19.)

In an HNR dated March 25, 2019, Plaintiff wrote "bad gout attack." (Doc. 115-5 at 25.) Plaintiff saw Nurse Mark Hopf that day, who documented that Plaintiff's right foot was swollen, red, warm, and tender to touch. (*Id*. at 9.) Hopf instructed Plaintiff to keep his foot elevated to alleviate swelling. (*Id*. at 12.) Hopf contacted Defendant Hahn, who gave verbal orders for a uric acid lab draw. (Doc. 86 ¶ 28.) The lab results indicated normal levels of uric acid. (*Id.* ¶ 29.) According to Plaintiff, when he saw the nurse that day, the nurse said, "you are in real bad shape let me see if I can get the NP to come look at it." (Doc. 8 at 15.) Defendant Hahn came over, and the nurse told Hahn that Plaintiff's foot was warm, and Plaintiff asked for medical ice. (*Id*.) Hahn said the "higher-ups was [sic] getting on them for giving out too much ice[.]" (*Id*.) Hahn said, "the last time I tried that you filed a grievance against me." (*Id*.) Plaintiff had also asked for crutches, and Hahn said, "I won't give you any crutches" because Plaintiff already had a wheelchair.

1   (*Id.*)  Plaintiff told Hahn he asked for crutches because his wheelchair was too big to enter
2   the restroom, and the crutches would support him without putting pressure on his foot.  (*Id.*
3   at 15-16.)  Hahn again said no, and Plaintiff said, "you all do not know what's causing me
4   to suffer like this—send me to a specialist.  That's when I was told to leave." (*Id.* at 16.)
5   On March 27, 2019, while in the restroom, Plaintiff fell and hit his head and blacked out
6   for possibly seconds.  (*Id.*)

7         Hahn does not recall Plaintiff requesting crutches at any time, but in the correctional
8   setting, crutches are generally only indicated for acute injuries such as fractures, sprains,
9   and contusions and can only be provided for short periods of time.  (Doc. 86 ¶¶ 13-14.)
10   Crutches pose a security risk because they can easily be used as a weapon, so their use is
11   carefully monitored and restricted by Arizona Department of Corrections, Rehabilitiation
12   and Reentry (ADCRR).  (*Id.* ¶ 14.)  As far as Hahn is aware, Plaintiff never submitted an
13   HNR requesting crutches.  (Doc. 86 ¶ 15.)  In any event, Plaintiff would not have qualified
14   for crutches at that time because he had a chronic (not acute) condition, he already had a
15   wheelchair, and he was housed in an ADA dorm.  (*Id.* ¶ 16.)  Hahn understood that ADA
16   dorms had accommodations for means of ingress and egress within the facility, including
17   bathrooms with handicap ramps and handrails.  (*Id.* ¶ 17.)  Plaintiff lived in dorm 7, an
18   ADA building, but the building did not have "any outer rails" and "was not considered
19   ADA accessible speaking of the bathroom area."  (Doc. 118 at 6 ¶ 14 (Pl. Decl.).)

20         Plaintiff's medical records indicate he was issued a quad cane in 2016 but never
21   crutches.  (Doc. 86 ¶ 18.)  Plaintiff was issued a cane from June 3, 2017 through June 2,
22   2019.  (Doc. 118 at 6 ¶ 11.)

23         On March 27, 2019, at 7:53 a.m., RN Stacey Fenwick received an order for Plaintiff
24   from Defendant Hahn for medical ice for three days.  (Doc. 86 ¶ 30; Doc. 86 at 39.)

25         At 12:14 p.m. on March 27, 2019, an Incident Command System Response was
26   initiated when Plaintiff fell in the bathroom.  (Doc. 86 ¶ 31.)  Security staff brought Plaintiff
27   to the medical HUB in his wheelchair, and he reported "gout pain in my foot made me
28   fall."  (*Id.*)  Plaintiff reportedly hit his back and the back of his head during the fall.  (*Id.*)

An assessment by Nurse Fenwick revealed slight redness on the left lateral posterior head and skin intact despite some tenderness. (*Id.*) Neuro checks and pupils were within normal limits, face was symmetrical, and Plaintiff was alert, oriented, and able to clearly communicate and answer questions appropriately. (*Id.*) Plaintiff's right foot had some swelling and redness on the big toe. (*Id.* ¶ 32.) Plaintiff was given SNOs for bed rest and no duty, and Naproxen 375 mg for 30 days for pain per Defendant Hahn's verbal orders. (*Id.*) Plaintiff was educated on the signs and symptoms of concussion and instructed to rest and ice his head every 15 minutes. (Doc. 86 ¶ 32.) Plaintiff was reassessed by Nurse Connary at 5:01 p.m. that same day, and his exam was unchanged. (*Id.* ¶ 33.) Hahn knew that Naproxen did not help Plaintiff. (Doc. 118 at 6 ¶ 16.)

On March 28, 2019, Plaintiff filed an Inmate Grievance, asserting that on March 25, 2019, NP Hahn and Nurse Mike left him in extreme pain and without any medical treatment for his gout inflammation and "[a]s a direct result I have suffered injury." (Doc. 115-1 at 3.) Plaintiff said he was still in pain and the only person who interceded was Nurse Fenwick, who issued Plaintiff medical ice on March 27, 2019. (*Id.*) Plaintiff wrote that NP Hahn knew medical ice helped with the pain and inflammation during gout attacks, but she "and Nurse Mike denied that treatment in their words 'the higher-ups are getting on them for handing out to[o] much ice.'" (*Id.*) Plaintiff told Hahn, "you know that works [but] she still denied me." (*Id.*) Plaintiff asked to see a doctor who will properly assess his medical problem. (*Id.*)

On April 8, 2019, Facility Health Administrator Adam Perkins responded to Plaintiff's Grievance. (Doc. 115-1 at 2.) Perkins wrote that Plaintiff was seen on the nurse line on March 25, 2019, a uric acid blood test was ordered, and the results were within normal limits. (*Id.*) Perkins further noted that Plaintiff was seen on the nurse line on March 27, 2019, and Hahn gave orders for naproxen and SNOs for bed rest, no work, lay-in for 2 days, and medical ice for 3 days. (*Id.*). Perkins concluded that Plaintiff was receiving treatment for his gout, that he should submit an HNR if he was still having issues, and that the matter was resolved. (*Id.*)

1    **C.    Legal Standard**

2         To support a medical care claim under the Eighth Amendment, a prisoner must

3    demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d

4    1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are

5    two prongs to the deliberate-indifference analysis: an objective standard and a subjective

6    standard.  First, a prisoner must show a "serious medical need." *Id.* (citations omitted).  A

7    "'serious' medical need exists if the failure to treat a prisoner's condition could result in

8    further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*,

9    974 F.2d at 1059–60 (internal citation omitted).  Examples of indications that a prisoner

10   has a serious medical need include "[t]he existence of an injury that a reasonable doctor or

11   patient would find important and worthy of comment or treatment; the presence of a

12   medical condition that significantly affects an individual's daily activities; or the existence

13   of chronic and substantial pain." *Id.* at 1059–60.

14        Second, a prisoner must show that the defendant's response to that need was

15   deliberately indifferent.   *Jett*, 439 F.3d at 1096.   "Prison officials are deliberately

16   indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally

17   interfere with medical treatment.'" *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir.

18   1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)).  Deliberate

19   indifference may also be shown where prison officials fail to respond to a prisoner's pain

20   or possible medical need.  *Jett*, 439 F.3d at 1096.  "In deciding whether there has been

21   deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the

22   judgment of prison doctors or administrators.'" *Colwell v. Bannister*, 763 F.3d 1060, 1066

23   (9th Cir. 2014) (quoting *Hunt v. Dental Dep' t*, 865 F.2d 198, 200 (9th Cir. 1989)).

24        Even if deliberate indifference is shown, to support an Eighth Amendment claim,

25   the prisoner must demonstrate harm caused by the indifference.  *Jett*, 439 F.3d at 1096; *see*

26   *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical

27   treatment does not constitute Eighth Amendment violation unless delay was harmful).

28

### D.   Discussion

#### 1.   Serious Medical Need

There is no dispute that Plaintiff's gout condition constituted a serious medical need. Further, the available medical records show that Plaintiff's condition was "worthy of comment or treatment[,]" including medical appointments, blood testing, issuance of SNOs, a medical diet, and housing in an ADA dorm. *See McGuckin*, 974 F.2d at 1059-60. This record supports the finding of a serious medical need, and the Court will consider whether Defendant's actions amounted to deliberate indifference.

#### 2.   Deliberate Indifference

Plaintiff's First Amended Complaint focuses on the encounters with Defendant Hahn on February 7, 2019 and March 25, 2019. Defendant Hahn argues that even assuming she failed to provide adequate treatment at their only encounter on February 7, 2019, which she denies, there is no evidence of an egregious misdiagnosis or negligent medical care that rises to the level of an Eighth Amendment violation. (Doc. 85 at 8, citing *Ortiz v. City of Imperial*, 884 F.2d 1312, 1313-14 (9th Cir. 1989); *Hunt v. Dental Dept.*, 865 F.2d 198, 201 (9th Cir. 1989).)   Hahn asserts she does not recall asking Plaintiff to walk at the February 7, 2019 encounter and that it would not have been her custom to ask a wheelchair-bound prisoner to walk without first conducting a physical examination. (*Id.* at 8-9.)

Hahn's inability to remember factual information is insufficient because it does not show personal knowledge. *See* Fed. R. Civ. P. 56(c)(4) (sworn statement used to support summary judgment motion must be made on personal knowledge); *cf. Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412-13 (9th Cir. 1995).   And, Hahn's speculation as to what she would have done in the situation is subject to a credibility dispute that cannot be resolved on summary judgment. *See Anderson*, 477 U.S. at 249-50.   In addition, the medical records support that Hahn saw Plaintiff on at least three occasions—December 5, 2018, January 3, 2019, and February 7, 2019—and Plaintiff presents evidence that Hahn saw Plaintiff on March 25, 2019.

The Court must accept as true Plaintiff's averments that on February 7, 2019, Hahn told him to get up from his wheelchair and walk, that he fell against the wall and complained about the pain in his ankle and foot, that Hahn had a security officer order Plaintiff to continue walking, which Plaintiff did, that Plaintiff said, "please my gout is beginning to inflame and the pain is hurting me," but Hahn said "just a little more," and when Plaintiff finally reached his wheelchair, Hahn said, "oh my gosh, you are the one with chronic gout" and they should not have had him up walking, and Hahn apologized. (Doc. 8 at 13-14.)  The Court must also accept as true that Hahn told Plaintiff on March 25, 2019 that he could not have medical ice because Hahn said "higher-ups was [sic] getting on them for giving out too much ice," that Hahn said, "the last time I tried that you filed a grievance against me," and that Hahn would not give Plaintiff crutches because he was already in a wheelchair.  (*Id*. at 15.)[3]

Even accepting Plaintiff's averments as true, however, the encounter on February 7, 2019 amounts to unprofessional conduct or negligence, not deliberate indifference. *See Wood*, 900 F.2d at 1334 ("[i]n determining deliberate indifference, we scrutinize the particular facts and look for substantial indifference in the individual case, indicating more than mere negligence or isolated occurrences of neglect").  Based on Plaintiff's version of events, Hahn did not realize until the end of his walk that he had gout and should not have been walking, and she apologized and told a supervisor Plaintiff should not have been on the list of people being assessed for wheelchair needs.  Even though the evidence supports that Hahn had encountered Plaintiff on two previous occasions, there is no evidence that she remembered these encounters, that he had gout, or the severity of his gout.

---

[3] Defendant argues in her Reply that Plaintiff is not entitled to rely merely on his Complaint.  (Doc. 117 at 4.)  Contrary to Defendant's assertion, the Court may construe Plaintiff's verified First Amended Complaint as an affidavit in opposition to the summary judgment motion.  *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (allegations in a pro se plaintiff's verified pleadings must be considered as evidence in opposition to summary judgment); *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) (verified complaint may be used as an affidavit opposing summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence).

1    As to the March 25 incident involving Plaintiff's request for ice and crutches, the

2    record shows Hahn did order a uric acid test that day, but denied Plaintiff's request for ice,

3    stating the "higher-ups were getting on them for giving out too much ice." (Doc. 8 at 15.)

4    Two days later, Hahn authorized ice for Plaintiff.  It is not clear why Hahn authorized ice

5    for Plaintiff two days after he requested it, but Plaintiff has not provided evidence showing

6    that he was harmed by this two-day delay, or that ice was the only appropriate method for

7    treated his gout symptoms on March 25, as opposed to elevation of the affected extremity,

8    cold compresses, or other means.  Based on this record, no reasonable jury could conclude

9    that Hahn was deliberately indifferent on March 25 in not providing Plaintiff ice.

10    There is also insufficient evidence to support that Defendant Hahn was deliberately

11    indifferent in not providing Plaintiff with crutches on March 25.  Hahn has presented

12    evidence that crutches are only for acute conditions such as such as fractures, sprains, and

13    contusions, which Plaintiff did not have, that crutches can only be provided for short

14    periods of time, and Plaintiff already had a wheelchair, which she believed was appropriate

15    for his condition.  Hahn also avers that Plaintiff was housed in an ADA dorm, which she

16    understood to have accommodations for means of ingress and egress within the facility,

17    including bathrooms with handicap ramps and handrails.  (*Id.* ¶ 16.)  Although Plaintiff

18    asserts he told Hahn his wheelchair was too big to enter the restroom, he has presented

19    evidence that he had a quad cane at that time, and he does not say why he could not use the

20    quad cane if his wheelchair did not fit through the bathroom doorway.  Finally, Plaintiff

21    only presents conclusory evidence that he fell in the bathroom on March 27, 2019, "due to

22    the delay/denial of treatment by Hahn and her deliberate indifference to [Plaintiff's] serious

23    medical condition." (Doc. 8 at 16.)  Plaintiff does not say how he entered the bathroom

24    that day, that he would not have fallen if he had been supplied crutches two days earlier,

25    and he does not say how he was able to use the bathroom on other occasions, presumably

26    without crutches.  As such, Plaintiff's evidence is simply too vague and conclusory to

27    create a triable issue of fact that Hahn's failure to give him crutches caused him harm.  *See,*

28    *e.g., Nilsson v. City of Mesa*, 503 F.3d 947, 952 n.2 (9th Cir. 2007) ("a conclusory, self-

serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact") (citation omitted).

Accordingly, the Court will grant Defendant Hahn's Motion for Summary Judgment.

**IV.     Defendants Digiro, Harris, Scott, and Pond's Motion for Summary Judgment**

**A.     Plaintiff's Claims**

Plaintiff alleges that he was denied showers from April 11, 2019 until May 30, 2019 because Defendant Harris, who was the property officer at ASPC-Eyman, SMU, would not give Plaintiff his shower chair in retaliation for Plaintiff filing "grievance(s)/lawsuit" against Harris.  (Doc. 8 at 8, 11-12.)  Plaintiff alleges that on May 26, 2019, he was told to move his stuff from the bottom bunk to the top bunk, and when Plaintiff tried to explain to the officer that he was on the bottom bunk for medical reasons, the officer said, "I don't know" and that the movement sergeant, Defendant Digiro, "told him the move is to be done."  (*Id*. at 7-8.)  Plaintiff alleges that on August 17, 2019, he was issued a medical slip for recreation on a paved area only, but he was denied recreation "well over 20 times" by Defendants Pond and Scott.  (*Id*. at 10.)

Defendants Digiro, Harris, Scott, and Pond argue that Plaintiff failed to exhaust his administrative remedies with respect to each of these claims, and they alternatively move for summary judgment on the merits.  (Doc. 93.)

**B.     Exhaustion**

**1.     Legal Standard**

Under the PLRA, a prisoner must exhaust "available" administrative remedies before filing an action in federal court.  42 U.S.C. § 1997e(a); *see Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934–35 (9th Cir. 2005).  The prisoner must complete the administrative review process in accordance with the applicable rules.  *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006).  Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the

type of relief offered through the administrative process.  *Booth v. Churner*, 532 U.S. 731, 741 (2001).

Where a defendant asserts nonexhaustion, he bears the initial burden to show that there was an available administrative remedy and that the prisoner did not exhaust it. *Albino v. Baca*, 747 F.3d 1162, 1169, 1172 (9th Cir. 2014); *see Brown*, 422 F.3d at 936–37 (a defendant must demonstrate that applicable relief remained available in the grievance process).  Once that showing is made, the burden shifts to the prisoner, who must either demonstrate that he, in fact, exhausted administrative remedies or "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him."  *Albino*, 747 F.3d at 1172.  The ultimate burden, however, rests with the defendant.  *Id.*  In determining whether there was proper exhaustion, a court must consider the particular circumstances of a prisoner's case.  *See Fuqua v. Ryan*, 890 F.3d 838, 850 (9th Cir. 2018).  Summary judgment is appropriate if the undisputed evidence, viewed in the light most favorable to the prisoner, shows a failure to exhaust.  *Albino*, 747 F.3d at 1166, 1168; *see* Fed. R. Civ. P. 56(a).

If the defendant moves for summary judgment for failure to exhaust and the evidence shows that the plaintiff did, in fact, exhaust all available administrative remedies, it is appropriate for the court to grant summary judgment sua sponte for the nonmovant on the issue.  *See Albino*, 747 F.3d at 1176 (pro se prisoner did not cross-move for summary judgment on issue of exhaustion, but because he would have succeeded had he made such a motion, sua sponte grant of summary judgment was appropriate).

## 2.    Facts Relevant to Exhaustion

Plaintiff was housed at the ASPC-Florence South Unit, from January 4, 2018 until April 10, 2019.  (Doc. 94 (Defs.' Statement of Facts) ¶ 2.)  Plaintiff was transferred to the ASPC-Eyman SMU I on April 10, 2019, and resided in the SMU I Close Detention Unit from April 11, 2019 to May 30, 2019.  (*Id.* ¶ 3.)  Plaintiff was then housed at ASPC-Eyman

1   SMU I West from May 30, 2019 to May 3, 2020, and he currently resides at ASPC-Eyman
2   SMU I West.  (*Id.* ¶¶ 4-5.)

3           Defendant Harris has been employed as a Property Sergeant at ASPC-Eyman SMU
4   I since 2014.  (*Id.* ¶ 6.)  Defendant Digiro was the Count Movement Supervisor at ASPC-
5   Eyman SMU I from October 2018 until October 2020.  (*Id.* ¶ 7.)  Defendant Pond was a
6   Sergeant at APSC-Eyman SMU I from May 2017 to August 2020.  (*Id.* ¶ 8.)  Defendant
7   Scott was the Associate Deputy Warden at ASPC-Eyman SMU I from March 2019 to
8   January 2020.  (*Id.* ¶ 9.)

9           The ADCRR's grievance process is set forth in Department Order (DO) 802, *Inmate*
10  *Grievance Procedure*.  (*Id.* ¶ 63.)  Under this procedure, a prisoner must first try to resolve
11  a complaint through informal means, such as discussion with staff in the area most
12  responsible for the complaint.  (*Id.* ¶ 66.)  If the complaint is not resolved, the prisoner may
13  submit an informal complaint on an Inmate Informal Complaint Resolution form to the unit
14  CO III within 10 days from the date of the action underlying the complaint.  (*Id.* ¶ 67; Doc.
15  94-9 at 5 ¶ 21.)  If the complaint is still not resolved, the prisoner may submit a formal
16  Inmate Grievance to the CO IV Grievance Coordinator within 5 days from the CO III's
17  response.  (Doc. 94 ¶¶ 68-69.)  The Deputy Warden issues a written response to the Inmate
18  Grievance within 15 workdays.  (*Id.* ¶ 70.)  If the prisoner seeks to appeal the Deputy
19  Warden's response, he may submit an appeal to the Director within 5 workdays of receipt
20  of the Deputy Warden's response, and within 30 calendar days of receipt of the appeal, the
21  Central Office Appeals Officer prepares a response for the Director's or his designee's
22  signature.  (*Id.* ¶¶ 71, 74.)  The Director's response is final, and ADCRR considers this step
23  to constitute exhaustion of all remedies within ADCRR for standard grievances.  (*Id.* ¶ 75.)
24  If a prisoner does not receive a response at any level of the Inmate Grievance Procedure,
25  he may proceed to the next level after the time for a response has expired.  (Doc. 94-9 at 4
26  ¶ 18 (Barreras Decl.).)

27          According to Defendants, Plaintiff did not submit any grievances at ASPC-Eyman
28  SMU I between April 2019 and December 2019 with respect to his claims against

1   Defendants Harris, Digiro, Pond, and Scott.  (Doc. 94 ¶ 76.)  They further assert that
2   Plaintiff did not submit any grievance appeals to the Director's level with respect to his
3   claims against Defendants Harris, Digiro, Pond, and Scott.  (*Id.* ¶ 77.)

4          As support, Defendants present the Declaration of Daniel Backes, a CO IV and the
5   grievance coordinator at the ASPC-Eyman SMU.  (Doc. 94-10 at 2 ¶¶ 1, 3.)  As the
6   grievance coordinator, Backes' duties include conducting grievance investigations,
7   tracking prisoner grievances at ASPC-Eyman SMU, and maintaining the logs of all
8   processed grievances and appeals at ASPC-Eyman SMU.  (*Id.* ¶ 3.)  Backes reviewed the
9   Unit Grievance Coordinator Log for any processed formal grievances and any processed
10  grievance appeals filed at ASPC-Eyman SMU by Plaintiff between April 2019 and
11  November 2019, but found no processed formal grievances or appeals by Plaintiff alleging
12  Defendant Harris retaliated against him by denying him access to his shower chair, that
13  Defendant Digiro failed to comply with his SNO for a lower bunk, that Defendant Pond
14  denied him recreation on a paved area, or that Defendant Scott denied him recreation on a
15  paved area in retaliation for sending Defendant Scott inmate letters.  (*Id.* ¶¶ 4, 6-8.)  In
16  Backes' review, he located a formal grievance Plaintiff submitted on August 13, 2019,
17  regarding a SNO for a blanket.  (*Id.* ¶ 5.)

18         Defendants also present a Declaration by Janah Barreras, an Administrative
19  Services Officer II at ADCRR's Central Office in Phoenix, Arizona.  (Doc. 94-9 at 2 ¶ 1.)
20  Barreras' duties include responding to and tracking non-medical or "standard" grievance
21  appeals to the Director and maintaining a computerized Inmate Grievance Appeal Log of
22  such appeals.  (*Id.* ¶ 3.)  Barreras reviewed the non-medical grievance appeal log at the
23  Central Office and searched for any formal non-medical grievance appeals submitted to
24  the Director's level by Plaintiff between April and December 2019.  (*Id.* ¶ 38.)  Barreras
25  found no grievance appeal entries in the Central Office Grievance Appeal Log showing
26  Plaintiff made any appeals to the Director alleging Defendant Harris retaliated against him
27  by denying him access to his shower chair, that Defendant Digiro failed to comply with his
28  SNO for a lower bunk, that Defendant Pond denied him recreation on a paved area, or that

1    Defendant Scott denied him recreation on a paved area in retaliation for sending Defendant
2    Scott inmate letters.  (*Id.* ¶¶ 39-41.)

3         In Request No. 5 of their First Request for Production of Documents, Defendants
4    asked Plaintiff to produce a copy of any letters, inmate letters, grievances, or other
5    correspondence Plaintiff submitted to the State of Arizona, ADCRR, or its employees
6    regarding the allegations in the Complaint.  (Doc. 94 ¶ 81.)  In his response, Plaintiff did
7    not provide any grievances or grievance appeals to demonstrate that he properly exhausted
8    his issues pertaining to his claims against Harris, Digiro, Pond and Scott.  (*Id.* ¶ 83.)

9         In his response to Defendants' Statement of Facts, Plaintiff states that he disputes
10   all of Defendants' facts in their paragraphs 63-77, and he cites to his Exhibit 8, but Plaintiff
11   does not say what he disputes about either ADCRR's grievance process or his grievance
12   record.  (*See* Doc. 136 at 2.)  He also states that he disputes Defendants' facts in paragraphs
13   78-82 and cites "Exhibit," but the Exhibit number or letter does not appear in the Court's
14   copy.  (*See id.*)

15        Plaintiff's Exhibit 8 is a Health Services Encounter record dated April 25, 2019, in
16   which Plaintiff saw RN Kasper at Sick Call for his swollen right foot.  (Doc. 137 at 48-52.)
17   There are no inmate letters, grievances, or grievance appeals in Plaintiff's Exhibit 8.  (*See*
18   *id.*)  To the extent, Plaintiff meant to cite to his Exhibit 9, that is an Inmate Informal
19   Complaint Resolution dated June 27, 2019, and addressed to "CO III," stating that it is a
20   burden for Plaintiff to get to the large recreation field because he is in a wheelchair, his
21   gout makes it hard to push himself, he does not have a wheelchair pusher, and no officer
22   will help him.  (Doc. 137 at 54.)  Plaintiff asked why he could not use the pod's recreation
23   pen, which could be secured.  (*Id.*)  Plaintiff noted at the bottom of the form that he had
24   discussed the issue with Sergeant Pond.  (*Id.*)  Plaintiff also presents an Inmate Letter
25   addressed to Sergeant Pond that appears to be dated January 20, 2020, stating he had been
26   asking about recreation since August 2019.  (*Id.* at 56.)  The next few lines are not legible,
27   but the final sentence says, "I know you schedule rec[reation] for this cluster."  (*Id.*)

28

1  Plaintiff may also have been referring to his First Amended Complaint at Doc. 8.
2  In that document, Plaintiff stated that around April 14, 2019, he sent Defendant Harris an
3  Inmate Letter expressing the urgent need for his shower chair, and that was the first of at
4  least 3 Inmate Letters he sent for his shower chair "that Harris or other property officer
5  never responded to." (Doc. 8 at 12.) Plaintiff also states that he wrote "Medical and D.W.
6  McAdorey" about "not being housed to where I can sit while I shower due to my inflamed
7  gout" and Harris refusing Plaintiff his shower chair.[4] (*Id*.) Plaintiff asserts that he sent two
8  Inmate Letters prior to September 2, 2019, about the denial of recreation. (*Id*. at 10.) The
9  complaint form contains a section about Administrative Remedies, asking if a prisoner
10  submitted a request for administrative relief at each level and, if not, to explain why. (*Id*.
11  at 11.) Plaintiff did not check any of the boxes saying whether he did or did not submit
12  any administrative remedies, but he did write, "They would not respond. As is the norm.
13  Making the process Unavailable." (*Id*.)

14  **3.  Discussion**

15  Defendants have met their initial burden of showing that ADCRR had an
16  administrative remedy available as outlined in DO 802 and that Plaintiff did not timely
17  complete the grievance process regarding the shower chair, the lower bunk, or the lack of
18  recreation prior to filing his Complaint. The burden therefore shifts to Plaintiff to either
19  show he exhausted the available remedies or that the remedy was effectively unavailable
20  to him. *Albino*, 747 F.3d at 1172.

21  The Court did not locate any argument by Plaintiff in his response documents
22  regarding exhaustion of administrative remedies. (*See* Docs. 134, 135, 136, 137, 139.)
23  While Plaintiff does present two Inmate Letters on the issue of recreation, he does not
24  explain why he did not proceed after that with the grievance process as required by DO
25  802, even if he did not receive a response. (*See* Doc. 94-9 at 27 ("If an inmate does not

26

27  [4] The Court did not locate in Plaintiff's evidence the Inmate Letters he sent to
28  Defendant Harris, Medical, or DW McAdorey. Plaintiff states in his Response "[t]hat custom and practice of pas[s]ing out one page inmate letters leaves the inmate w/o a copy should it not be answered by the person it was sent to." (Doc. 135 at 7.)

1    receive a response within the time period specified, his/her time to proceed to the next stage
2    of the grievance process is the same as if he/she had received a response.  The time to
3    proceed to the next stage of the grievance process begins to run the day after a response
4    was due back to the inmate.").)

5          Plaintiff's assertion in his First Amended Complaint that "[t]hey would not respond.
6    As is the norm.  Making the process Unavailable," is insufficient to meet his burden.
7    Plaintiff did not check any of the boxes in the FAC indicating whether administrative
8    remedies were available at his institution, whether he submitted a request for relief, or
9    appealed his request for relief to the highest level.  Based on that, it appears that Plaintiff
10   simply concluded in advance that using the grievance process would be futile, and he did
11   not even attempt to use the grievance process.  If Plaintiff did attempt to use the grievance
12   process, Plaintiff does not provide any details about when he may have attempted to grieve
13   the issues in this action, what he said in his grievance documents, who he gave his
14   grievances to, or who failed to respond.  As such, Plaintiff's single statement in his First
15   Amended Complaint is too conclusory to create a genuine issue of material fact.  *See*
16   *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory,
17   speculative testimony in affidavits and moving papers is insufficient to raise genuine issues
18   of fact and defeat summary judgment.)

19         Absent specific evidence showing that Plaintiff followed all steps of the grievance
20   process with respect to his claims against Defendants Digiro, Harris, Scott, and Pond, or
21   credible evidence showing that he was thwarted from doing so by a prison official,
22   Plaintiff's unsupported statements are insufficient to show that he exhausted his claims
23   against these Defendants or that the administrative remedy was unavailable to him.
24   Accordingly, the Court will grant Defendants' Motion for Summary Judgment based on
25   exhaustion.[5]

26   . . . .

27   
28          [5] In light of this determination, the Court need not address the parties' arguments
     regarding the merits of Plaintiff's claims.

V.      **Plaintiff's Motions for Injunctive Relief**

In the first pending motion for injunctive relief filed on January 11, 2022, Plaintiff states that prison administrators have allowed Plaintiff's brand-new typewriter to be damaged, and that a prisoner named Madej, who has been assisting him with his court filings, may have to stop helping him due to harassment "to deter him from assisting Plaintiff's access to the Court." (Doc. 129 at 1-2.) Plaintiff states that Madej is "kinsman to him. Therefore, no disciplinary infraction for having to pay, trade or barter." (*Id*. at 1.) As relief, Plaintiff asks for an order requiring prison staff to "provide an alternative that will prevent Plaintiff from being denied access to the Court." (*Id*. at 2.)

Plaintiff states that the problem with his typewriter is further explained in a motion for injunctive relief he filed in a different case, *Derello v. Romero*, No. CV 21-00129-PHX-MTL (JFM) (D. Ariz.). (*Id*. at 1.) Plaintiff asserted in *Derello v. Romero* that he had been permitted to possess a typewriter for medical reasons but that he was moved to a new cell that was infested with roaches, which got into his typewriter and damaged it. (Doc. 27 in *Derello v. Romero*.) Plaintiff requested an order allowing him to use an ADCRR computer until his typewriter was repaired. (*Id*.) Defendant in that case conceded that Plaintiff's typewriter was not functioning, and Defendant did not oppose providing Plaintiff access to a unit computer for 2 hours a day, 3 days a week. (Doc. 33 in *Derello v. Romero*.) Defendant explained this time limitation was due to Plaintiff's status as a closed-custody prisoner, whose movements within the prison must be controlled for all out-of-cell time, and a staff member would have to supervise Plaintiff whenever he used the computer. (*Id*.) In an Order dated January 25, 2022, the Court granted Plaintiff's motion for injunctive relief, in part, and directed Defendant to provide Plaintiff with access to a unit computer 2 hours a day, 3 days a week. (Doc. 35 in *Derello v. Romero*.)

In the present case, Defendants argue that Plaintiff's motion should be denied because Plaintiff has been provided a meaningful alternative to using an "inmate writ writer" by allowing Plaintiff to access the unit computers for 2 hours a day, 3 days a week. (Doc. 132 at 3.)

- 22 -

Plaintiff replied on January 31, 2022, that Defendants wrongly led the Court to believe he had access to computer use, and if Madej had been allowed to assist him, he would have completed his response to Defendant's Motion for Summary Judgment. (Doc. 140 at 1.) Plaintiff states that, instead, he "was compelled to submit an unfinished version of his summary judgment." (*Id*.) Plaintiff states that he was only allowed to use the computer for about 25 minutes on January 27, 2022 and was told he would get more time the next day, but that did not happen because his CO III was sick. (*Id*. at 1-2.) Plaintiff states that "[i]t[']s these foreseen complications plaintiff need a writer for at least two days a week." (*Id*. at 2.) Plaintiff concludes that he just spoke with CO IVs Scott and Sutton on January 31, 2022, and they "may have resolved the issue they now both seem to understand Plaintiff's need for Madej to write for him" and "[s]hould that understanding come abut th[e]n this matter would be resolved." (*Id*. at 3.)

In his second pending motion for injunctive relief filed on February 4, 2022, Plaintiff states that when he asked for help in filling out paperwork to have his typewriter sent out for repairs, CO IV Sutton said he cannot provide help and Plaintiff "must only stay with the Two hours of Computer use." (Doc. 143 at 1-2.) Plaintiff asked, "how is he suppose[d] to get the papers done to send out his typewriter, file grievances, and informals," and he was told "he must stay within the court's order." (*Id*.) Plaintiff asks in this motion "for a writer at least for the othe[r] two days that plaintiff is not allowed to use the computer or that plaintiff be granted more time/ or days to use the computer." (*Id*.)

Defendants were ordered to respond to this second motion by February 22, 2022 (Doc. 145), but the Court can resolve this second motion without awaiting further briefing.

Plaintiff does not say in his first motion or reply what was unfinished in his Response to Defendants Digiro, Harris, Scott, and Pond's Motion for Summary Judgment, which he filed on January 26, 2022. Plaintiff's second pending motion does not say anything at all about needing injunctive relief to further respond to the Motion for Summary Judgment or anything else pending in this case. The Court notes that Defendants Digiro, Harris, Scott, and Pond filed their Motion for Summary Judgment on August 26,

2021, and Plaintiff's response was due September 29, 2021.  (Docs. 93, 96.)  Plaintiff was subsequently granted an extension of time to October 13, 2021, to respond based on Plaintiff's representation that the prison librarian's employment had been terminated and no court filings were being processed at that time.  (Doc. 106.)  Plaintiff was granted a second extension of time until November 3, 2021, based on Plaintiff's representation that the two pending Motions for Summary Judgment in this case had become overwhelming and he needed an additional three weeks to respond to them.  (Doc. 110.)  Plaintiff submitted a third motion for extension of time to the prison librarian for filing on November 5, 2021, asserting that he "has ran into a cluster of court deadlines" but that he was all caught up except for this case and a Ninth Circuit case.[6]  (Doc. 120 at 3.)  The Court did not receive that motion for extension of time, and in another motion for extension of time filed on January 6, 2022, Plaintiff asserted that he had only recently learned that the unit librarian did not file his November 5, 2021 motion, there was now an issue with his typewriter, and he was "trying to get access to his inmate assistant/computer use."  (Doc. 127.)  The Court granted that motion for extension of time but noted "the extraordinary amount of time already allowed to Plaintiff," and set a short deadline of January 25, 2021, for Plaintiff to respond to Defendants Digiro, Harris, Scott, and Pond's Motion for Summary Judgment.  (Doc. 128.)

Because Plaintiff has filed his Response to Defendants Digiro, Harris, Scott, and Pond's Motion for Summary Judgment, through multiple filings, and he does not say in his motions for injunctive relief what is missing from that Response or that he needs more time to complete his Response or address anything else pending in this case, the Court will deny Plaintiff's motions for injunctive relief as moot.

**VI.    Plaintiff's Miscellaneous Motions**

In Plaintiff's "Motion to Correct Wrongly Added Grievance to (DKT. 129)," Plaintiff states that he submitted the wrong Attachment (A) to his "Motion in Reply to

---

[6] Plaintiff filed his Response to Defendant Hahn's Motion for Summary Judgment on October 21, 2021, and his subsequent requests for extensions of time only related to his response to Defendants Digiro, Harris, Scott, and Pond's Motion for Summary Judgment.

DKT. 132," and he asks the Court to accept the correct Attachment (A), which is a grievance dated December 16, 2021, about the typewriter. (Doc. 148.) Although not entirely clear, it appears Plaintiff wants to supplement the reply in support of his first motion for injunctive relief. Because the Court is denying the motion for injunctive relief, and the grievance document Plaintiff seeks to add will not change the Court's analysis, the Court will deny this Motion to Correct as moot.

In his "Motion to Correct Submitted Unsigned Motion (DKT. 139)," Plaintiff states that he is unsure if he submitted a signed copy of his Motion at Doc. 139, and he asks the Court to accept his signed copy. (Doc. 149.) Plaintiff's Motion at Doc. 139 is unsigned, and the Court will grant this Motion to Correct and accept the signed copy.

In his Motion to Inform the Court, Plaintiff informs the Court of the cost of repairing or replacing his typewriter. (Doc. 150.) Plaintiff does not appear to seek any relief in this motion, but to the extent he does, the Court will deny the Motion to Inform.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendant Hahn's Motion for Summary Judgment (Doc. 85), Defendants Digiro, Harris, Scott, and Pond's Motion for Summary Judgment (Doc. 93), and the following motions filed by Plaintiff: "Motion to Inform the Court of a Pressing D[i]lemma" (Doc. 129) and "Motion to Notify Court" (Doc. 143), which the Court has construed as motions for injunctive relief; "Motion to Correct Wrongly Added Grievance to (DKT. 129)" (Doc. 148); "Motion to Correct Submitted Unsigned Motion (DKT. 139)" (Doc. 149), and "Motion to Inform the Court of an Unexpected Circumstance" (Doc. 150).

(2)     Plaintiff's "Motion to Inform the Court of a Pressing D[i]lemma" (Doc. 129), "Motion to Notify Court" (Doc. 143), "Motion to Correct Wrongly Added Grievance to (DKT. 129)" (Doc. 148), and "Motion to Inform the Court of an Unexpected Circumstance" (Doc. 150) are **denied**.

(3)     Plaintiff's "Motion to Correct Submitted Unsigned Motion (DKT. 139)" (Doc. 149) is **granted**.

     (4)    Defendant Hahn's Motion for Summary Judgment (Doc. 85) is **granted**. Defendant Hahn is **dismissed with prejudice**.

     (5)    Defendants Digiro, Harris, Scott, and Pond's Motion for Summary Judgment (Doc. 93) is **granted**. Defendants Digiro, Harris, Scott, and Pond are **dismissed without prejudice** based on Plaintiff's failure to exhaust the available administrative remedy.

     (6)    The Clerk of Court must terminate this action and enter judgment accordingly.

     Dated this 22nd day of February, 2022.

Michael T. Liburdi
United States District Judge